# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　Plaintiff,<br><br>　　　　　v.<br><br>**FEDWIN MORALES PÉREZ,**<br>　　Defendant. | CRIM. NO. 23-300 (FAB-MDM) |

## REPORT AND RECOMMENDATION

The defendant, Fedwin Morales Pérez ("defendant"), stands charged in a one-count indictment with illegally possessing multiple machine guns on January 25, 2023, in violation of Title 18, *United States Code*, Sections 922(o) (the "Indictment"). *See* Docket No. 3.

Pending before the Court is defendant's motion to suppress all the evidence seized on January 25, 2023, as well as all the evidence seized on August 15, 2023, the day of his arrest by federal authorities (the "Motion to Suppress"). *See* Docket No. 56. The government filed a *Response in Opposition to Defendant's Motion to Suppress* (s*ee* Docket No. 65), and the defendant filed a *Motion Supplementing Motion to Suppress and Identifying Relevant Documents Previously Submitted* ("Motion Supplementing the Motion to Suppress"). *See* Docket No. 66.

Over a period of two days, beginning on October 25, 2024, and concluding on November 14, 2024, the Court heard testimony from one government witness and three defense witnesses. More specifically, the government presented the testimony of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Damon Cavender ("Agent Cavender"). Agent Cavender was the Deputy Team Commander of ATF's national Special Response Team ("SRT") and the team leader in charge of executing the arrest of the defendant on August 15, 2024. *See* Docket No. 82 at 84-85. After presenting Agent Cavender's testimony, the government rested.

The defendant then presented the testimony of ATF Task Force Officers ("TFO") Carlos Alcoba Freitas ("TFO Alcoba") and Charlie Vega ("TFO Vega"). TFO's Alcoba and Vega testified about the surveillance they conducted on the defendant's home in the days leading up to his arrest on August 15, 2023. Defendant's last witness was his then consensual partner, Ms. Yamilet Rodríguez ("Ms. Rodríguez").[1] Ms. Rodríguez is the mother of defendant's ten-year-old son. Ms. Rodríguez is also the mother of a six-year-old boy who is unrelated to the defendant. Ms. Rodríguez and her two sons were present at the defendant's home on the morning of August 15, 2023, when federal agents arrested the defendant.

After hearing from the witnesses and listening to argument from counsel, the Court ordered the parties to submit post-hearing briefs. The government filed its Post-Hearing Brief on December 16, 2024 (*see* Docket No. 94), and the defendant filed his Post-Hearing Brief on February 5, 2025 (*see* Docket No. 107).

The defendant contends that the evidence seized on January 25, 2023, was the product of an unlawful intervention by law enforcement officers and an illegal warrantless search of his vehicle. The defendant also challenges the legality of the warrantless search that led to the discovery in his home of green aluminum foil wrappers typically used to package narcotics. The green aluminum foil wrappers were used to support the probable cause for two search warrants that led to the seizure and subsequent search of several electronic devices found at his home. He claims that the protective sweep of his home and the discovery of the green aluminum foil wrappers violated his Fourth Amendment rights. Accordingly, the defendant requests that all the evidence in this case be suppressed as fruit of the poisonous tree. For the reasons discussed below, the Court recommends that defendant's Motion to Suppress be **Granted in Part and Denied in Part**.

---

[1] The witness's name was spelled two different ways in the transcripts of the two days of hearings, "Janilette Rodríguez" and "Yamilet Rodríguez." Notwithstanding the two different spellings, they both refer to the same person, defendant's former consensual partner and the mother of his then ten-year old son.

## I.    FACTUAL FINDINGS

### A. The January 25, 2023 recovery of abandoned evidence and the return of the Indictment[2]

On the morning of January 25, 2023, in response to a confidential tip, agents from the Puerto Rico Police Bureau ("PRPB"), Ponce Intelligence Division, conducted surveillance on the defendant's residence located in Juana Díaz, Puerto Rico (the "Residence"). Docket No. 65 at 1. The confidential tip had indicated that the defendant: 1) was in charge of two drug points, 2) was heavily armed, 3) was involved in multiple murders, and 4) drove a Toyota Corolla bearing license plate IZR330. *Id.* During the surveillance, an agent saw the defendant get into a Toyota Corolla, depicted in the photo below, which matched the description given in the confidential tip.



The agent saw the defendant leave his Residence and drive up the street towards a cul-de-sac. *Id. See also* Docket No. 82 at 90. Once there, the defendant parked the vehicle in reverse, got out, and walked into the woods. Docket No. 65 at 1 and Docket No. 82 at 90.

---

[2] Many of the factual findings related to the events of January 25, 2023, were taken from the proffer of facts in the Government's Response to Defendant's Motion to Suppress. This is so because little to no testimony was presented during the hearing as to the facts surrounding the January 25, 2023 recovery of abandoned evidence. As will be explained later in this Report and Recommendation, on the first day of the evidentiary hearing, before the presentation of any testimony, the Court found that the defendant had not met his initial threshold burden to prove 1) that he was entitled to a hearing as to his challenge to the contraband items recovered on January 25, 2023, or 2) that he had standing to challenge the seizure of those items. The Court did, however, allow testimony, and ultimately did find that the defendant had standing to challenge the seizure of the items recovered from his Residence on August 15, 2023. Where possible, the Court cites to relevant sections of the hearing transcript.

A few minutes later, the agent saw the defendant exit the woods walking quickly and carrying a black and orange rifle together with an orange backpack. *See* Docket No. 65 at 1; s*ee also* Docket No. 82 at 90. The defendant got back in the blue Toyota Corolla and drove towards the exit of the urbanization. *Id.* The agent passed this information along to his colleagues who were sitting in a marked police vehicle. *Id.*

The PRPB agents in the marked vehicle attempted to conduct a traffic stop using their lights, sirens and public announcement speaker, but the defendant ignored their commands. *Id.* The agents then began a pursuit. The defendant continued driving down a dirt road until he stopped suddenly and exited the vehicle leaving the driver's side door open. *Id.* Upon exiting the vehicle, the defendant looked back at the marked patrol car and ran towards the woods carrying the black and orange rifle and the orange backpack. *Id.* One of the agents remained by the blue Toyota Corolla to take custody of the abandoned vehicle while the other agent continued the pursuit on foot. *See* Docket No. 65 at 1; *see also* Docket No. 82 at 90.

During the foot chase, the defendant once again was given commands to stop. Docket No. 65 at 2. Instead of stopping, however, the defendant dropped the black and orange rifle and the orange backpack and fled deeper into the woods, losing his sandal in the process. *Id.* Upon seeing the abandoned firearm and orange backpack on the floor, the pursuing agent broke off the chase and seized the items. Docket No. 65 at 2 and Docket No. 82 at 90. As shown in the photos below, the firearm turned out to be a black and orange, Anderson Manufacturing, AM-15, .223 caliber machinegun, loaded with 40 rounds of ammunition. Inside the orange backpack agents recovered $7,300 in small bills. *See* Docket No. 65 at 2; *see also* Docket No. 82 at 90.

 

Upon returning to the vehicle, the agents could see the barrel of a rifle sticking out of a plastic box in the driver's side back seat of the car. *Id. See* photo below.



One of the agents contacted the registered owner of the blue Toyota Corolla, who disclaimed ownership but nevertheless gave his consent to search the vehicle. *Id.* The agents then searched the abandoned vehicle and seized a total of eight (8) firearms, one of which had been reported stolen, more than 1,000 rounds of ammunition, and a white powder commonly used as a cutting agent for controlled substances. *Id. See* photo below of all the items seized from the vehicle.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 6 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 6
Crim. No. 23-300 (FAB-MDM)



Two of the firearms seized were machineguns, a black Anderson Manufacturing, AM-15, .300 blackout caliber, and an Anderson Manufacturing, AM-15, .223 caliber. *Id.*

On August 10, 2023, the grand jury returned an indictment against the defendant charging him with illegal possession of the three (3) machineguns that were abandoned in the chase (the "Indictment"). A federal arrest warrant was then issued for the defendant (the "Arrest Warrant"). *Id.*

**B. Surveillance conducted in the days leading up to the execution of the Arrest Warrant**

On August 9, 2023, TFO Alcoba conducted surveillance on the defendant's Residence in preparation for executing the Arrest Warrant. TFO Alcoba began his surveillance at approximately 5:40AM and concluded his surveillance at 2:00PM. Docket No. 82 at 194-95. TFO Alcoba chose to conduct the surveillance at that time of day to best mimic the time when the agents proposed to execute defendant's arrest in the coming days. During his surveillance that day, TFO Alcoba did not see anyone in the residence, nor did he witness any criminal activity. *Id.*

On August 10, 2023, TFO Vega continued surveillance on the defendant's Residence. His surveillance began at approximately 6:10AM and continued until approximately 10:30AM-11:00AM. *Id.* at 215-17. Approximately 40 minutes into the surveillance, TFO Vega saw the defendant exit the Residence "looking at the surrounding area and recording with his cell phone while pretending to pick up the

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 7 of 46

*United States v. Fedwin Morales-Pérez*                                        Page 7
Crim. No. 23-300 (FAB-MDM)

mail." He did not see anyone else in the Residence that day, nor did he witness any criminal activity. *Id.*

On August 11, 2023, TFO Alcoba returned to the defendant's Residence to conduct a third day of surveillance. He arrived at approximately 5:30AM but was forced to cut the surveillance short around 11:00AM after it appeared that his cover had been compromised by someone in the neighborhood.[3] Docket No. 82 at 196-99. Before suspending his surveillance, however, he saw the defendant leave the premises on a motocross-style motorcycle wearing a "balaclava-type" mask over his face. *Id.* TFO Alcoba did not see anyone else at the defendant's Residence during his surveillance that day, nor did he witness any criminal activity. *Id.*

On August 14, 2023, the day before the planned execution of the Arrest Warrant, Agent Cavender and another SRT member conducted surveillance of defendant's Residence from a wooded area close to where the defendant had abandoned his vehicle back on January 25, 2023. Though that vantage point did not give him a direct view of the Residence, he nevertheless said he used a "technical device"[4] that provided a view of the house on a screen. *Id.* at 141. The surveillance started at around 5:00AM-5:30AM and continued until approximately 6:30AM-7:00AM, which was more or less the time the Arrest Warrant was expected to be executed the next day. *Id.* at 143. Agent Cavender stated that he could not recall whether he observed anyone else in the Residence during the surveillance conducted that day. *Id.* at 144. He did indicate, however, that he did not observe any weapons, narcotics or illegal activity during his surveillance. *Id.* at 144.

Based on the intelligence gathered through their surveillance and otherwise, ATF agents knew that Ms. Rodríguez lived in the Residence with the defendant and

---

[3] TFO Alcoba explained that he was forced to break off his surveillance on August 11, 2023, because his partner had to use the restroom. While his partner was in the restroom at a nearby sports stadium, he noticed several individuals pointing down at him from the road above. Given the fact that he was in a high-crime neighborhood, and based on the individuals' conduct, TFO Alcoba felt threatened enough to draw his weapon and take cover behind a steel column. He and his partner were then escorted back to the Ponce police precinct by colleagues and the surveillance for that day was suspended.

[4] What was meant by the term "technical device" was not explained by Agent Cavender during the evidentiary hearing.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 8 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 8
Crim. No. 23-300 (FAB-MDM)

with her six-year-old son. *Id.* at 147. Agent Cavender testified during the evidentiary hearing that he was not given any intelligence that would have led him to believe that Ms. Rodríguez's and defendant's ten-year-old son would be present at the Residence at the time of the arrest.[5]

### C. The events of August 15, 2023 and the arrest of the defendant

On August 15, 2023, at approximately 6:27AM, ATF agents arrived at the defendant's Residence prepared to execute the Arrest Warrant. When the caravan of agents pulled up to the house in their dark SUVs, they saw the defendant sitting in the back of the open carport. Docket No. 82 at 94; *see also* Defendant's Composite Exhibit B[6] at minute 6:27:53.[7] Upon seeing the dark SUVs pull up to the house, the defendant jumped up and ran towards a door in the carport leading into the Residence. Exhibit B at minute 6:28:02. When the defendant got to the door, he opened it, stepped inside and waited a second, as if trying to decide whether to surrender or run into the house. Docket No. 82 at 94. He then proceeded to enter the house and closed the door behind him. *Id.* at minute 6:28:07.[8]

Approximately thirty (30) seconds later, the defendant walked out of that same door in the carport, followed some 20-30 seconds later by Ms. Rodríguez. *Id.* at 95. Exhibit B at minute 6:28:30. The agents immediately placed the defendant

---

[5] During the evidentiary hearing, Ms. Rodríguez testified that her sons were actually four and nine years old. Docket No. 89 at 7. For purposes of this Report and Recommendation, their actual ages are immaterial. Suffice it to say, Agent Cavender expected the younger son to be present in the house the day of the execution of the Arrest Warrant but did not expect the older son to be present.

[6] Defendant's Composite Exhibit B is a video that portrays Government's Exhibits 2 and 3, which are two videos taken from defendant's home security cameras, and plays them in coordination with their respective time stamps. Defendant's Composite Exhibit B allows the viewer to see what is happening simultaneously from two different camera angles. Defendant's Composite Exhibit B will be referred to hereinafter as "Exhibit B." Importantly, Agent Cavender testified that the time stamps on the security camera videos are one hour ahead of actual time. Therefore, when the time stamps on the videos read "7:28:00AM," the actual time is 6:28:00AM. Docket No. 82 at 110, lines 6-10.

[7] These time stamps are from "CAM 3," which is the video depicted on the right side of Exhibit B. Approximately two minutes into Exhibit B, the time stamps on the two videos begin to differ slightly.

[8] Ms. Rodríguez testified that when the defendant entered the house through the carport door, he immediately looked at the security cameras on the television screen in the master bedroom and then went back outside. Docket No. 89 at 11.

under arrest and detained Ms. Rodríguez for further investigation. Exhibit B at minute 6:29:43.[9]

Around the same time that the agents were placing the defendant under arrest in the carport, if not slightly after, another group of SRT agents breached the front door of the Residence under the guise of conducting a protective sweep of the premises. Exhibit B at minute 6:29:13. Agent Cavender testified that the purpose of the protective sweep was to verify whether there was anyone hiding inside the house who might be a threat to the agents conducting the arrest or to those who might be standing around outside the house after the arrest. Docket No. 82 at 98.

Agent Cavender explained that,

> [a] lot of these drug trafficking organizations that we've encountered they'll have other people spending the night with them even if it's not somebody that lives there all the time. It may be a random night where somebody spends the night with them. Docket No. 82 at 98.

> So, we always want to go through and check and just make sure that there's no other dangerous subjects inside so that when we are standing outside getting vehicles moved, turning suspects over to case agents, debriefing anybody there, getting more information, that we're safe and that the other agents are safe out there.

Agent Cavender testified that the front door of defendant's Residence was particularly difficult to breach and that it took more time than normal. Docket No. 82 at 107.

After breaching the front door, and purportedly as the first step in conducting the protective sweep, agents sent a drone into the house. Docket No. 82 at 168. Agent Cavender testified that a drone is sent in before any agent enters to allow the drone operator, who remains protected outside the house, to inspect the interior of the house through the drone's camera using a pair of goggles. *Id.* at 169. Agent Cavender also testified that it is ATF's policy not to record any part of the

---

[9] Ms. Rodríguez was placed in handcuffs and escorted to one of the law enforcement vehicles.

drone's video. *Id.* In the Residence's security camera video, the drone is seen entering the house at 6:29:25AM and exiting at 6:32:32AM.

Approximately thirty-one (31) seconds after the drone enters the house, namely at 6:29:56AM, and before it exits, Ms. Rodríguez's six-year-old son is seen exiting the house through the front door. He is immediately picked up by Agent Cavender and carried to his mother, who was waiting next to the lead law enforcement SUV parked in the driveway. Docket No. 82 at 97. Agent Cavender then rejoined his SRT teammates at the front door.

At precisely 6:30:40AM, six SRT agents entered the house. *See* Exhibit B. Approximately one minute later, a K-9 trained to identify the presence of human beings entered the front door together with his handler. Agent Cavender testified that the K-9 was a "tracking and bite dog." "All it does is scent and locate and track people and bite when needed." Docket No. 82 at 118. One minute after the K-9 entered the house, the drone exited through the front door. Exhibit B at minute 6:32:32AM. At 6:35:39AM, Ms. Rodríguez's ten-year-old son exited the house through the front door, followed immediately thereafter by the K-9 and his handler.

### D. The protective sweep and the search for Ms. Rodríguez's ten-year-old son

 After the agents arrested the defendant, detained Ms. Rodríguez, and successfully breached the front door to the Residence, Agent Cavender testified that he heard over the radio that there was a ten-year-old boy inside the house about whom the agents had no information.[10] Docket No. 82 at 97-98. Agent Cavender testified that,

> We went into every room in the residence initially doing a, you know, protective sweep, clearing the room for people. The people doing the protective sweep – I was pretty much running the team so I was standing in the hallway and did not enter a room initially. Once they told me that they hadn't found anybody I was kind of surprised because there

---

[10] Agent Cavender testified that "th[e] six-year-old child we knew about from intelligence given to me by the case agent. We didn't know anything about a ten-year-old child at this point." Docket No. 82 at 117-18.

> was supposed to be a ten-year-old boy inside and that no one had seen him anywhere.
>
> *So[,] I told everyone to conduct a second check* to make sure that because if we had missed a ten-year-old boy I didn't know who else we might have potentially missed. And I have been on operations before where suspects have been missed inside of houses or other violent people have been missed inside of houses, so I wanted to make sure there w[asn't] anybody else, any other violent people inside the house, and also that we found this ten-year-old child. We didn't know what condition he was in or where he was, but that was very unusual for us to not find a ten-year-old child.
>
> So[,] at that point I also began checking every room. When I walked into the bedroom at the back of the residence immediately as I looked through the room, about chest high, I saw a counter that had a plastic bag containing green aluminum foil that was consistent with narcotics packaging. I saw it, made a mental note of it, and then I continued searching the room, walked through all the rooms to make sure that all of the SRT members were searching all of the rooms well, conducting good searches, searching every little nook and cranny so that we could find any potential people in there and find the ten-year-old child, to make sure that he was okay.

Docket No. 82 at 99-100. (Emphasis added.)

Agent Cavender further stated that,

> roughly eight to ten minutes later he was found hiding under some blankets on a bed. It turns out people had looked under the bed, they had moved the bed, they had moved the mattress and had never detected him in there 'cause he's – he's ten years old, he's kind of slim. He could hide very easily and the covers that were on top of him, the blanket that was on top of him, it didn't look like anyone was underneath there. He was [curled] up into a little ball. And eventually one of the female SRT operators located him hiding under the blanket.

Docket No. 82 at 100-01. (Emphasis added.)

After the ten-year-old boy was found, he was escorted out the front door and was taken to his mother still waiting by the lead SUV.

Agent Cavender then met with the Case Agent, Special Agent Ricardo Jiménez ("Agent Jiménez"), in the front yard of the Residence and explained to him what he had found in the back bedroom, namely a plastic bag containing green aluminum foil that he believed was consistent with narcotics packaging. *Id.* at 103 and 124. Agent Cavender then escorted Agent Jiménez back into the Residence to show him exactly what he had seen and where he had seen it. *Id.*

Thereafter, the security camera video continued recording for several minutes showing ATF agents milling around outside the Residence. Agent Cavender explained that some of the agents are seen on the video approaching the front door, but he said they did so in order to inspect it and to learn how to defeat that type of door in the future. Agent Cavender also explained that he was asked by the Agent Jiménez to have the SRT agents remain on scene post arrest to provide security in case any members of defendant's drug trafficking organization decided to come and retaliate against the arresting agents. Docket No. 82 at 126-27 and 129. Agent Cavender clarified that no additional searches of the house were conducted at that time. *Id.* at 129

At approximately 6:45AM, the security camera video shows Agent Jiménez speaking on the phone and entering the house. Agent Cavender testified that he believed that Agent Jiménez was speaking with the Assistant United States Attorney ("AUSA") describing what was found inside the Residence. *Id.* at 130.

A few moments later, Ms. Rodríguez' handcuffs were removed by the agents and she and the children were escorted inside the house to wait more comfortably on the living room sofa. *Id.* at 134. Agent Cavender understood that they were going to be there for several more hours while waiting for a search warrant. *Id.* Prior to allowing Ms. Rodríguez and the children to sit on the couch, however, the agents made sure to check in and around the sofa cushions to make sure there were no firearms, weapons, narcotics or paraphernalia that could be hidden or obstructed by Ms. Rodríguez. Docket No. 82 at 134-35.

At approximately 6:59:13AM, agents standing guard outside the house noticed the presence of one of the video security cameras. Upon so noticing, one of the agents climbed up to the camera and adjusted it to point towards the sky, effectively stopping the recording of events in an around the defendant's Residence. *Id.* at 136. Agent Cavender testified that that was done because the agents generally do not want their faces to be recorded and posted on social media where people might be able to identify them. *Id.*

### E. The first search warrant issued for defendant's Residence

After successfully arresting the defendant, Agent Jiménez sought a warrant to search the Residence. The evidence used to support probable cause for the issuance of the warrant was based largely on the criminal conduct surrounding the January 25, 2023 incident wherein multiple firearms and cash were recovered from the defendant after he purportedly abandoned them during a police chase. The only new evidence linking the defendant's residence to any purported criminal conduct was that a "plastic bag containing green aluminum foil . . . consistent with narcotics packaging" that was seen by Agent Cavender during the protective sweep of the defendant's Residence after his arrest. More specifically, the relevant paragraph from Agent Jiménez's affidavit in support of the application for a search warrant read as follows:

> 13.    While serving the arrest warrant and conducting a security sweep of the TARGET RESIDENCE, officers observed the following items in plain view next to a safe and male shoes:
>
>> a. One zip-lock bag containing numerous green aluminum wrappings commonly used, based on my training and experience, to package narcotics such as heroin.
>
> 14.    A female present at the time of arrest in the residence indicated that the safe was used by MORALES-PEREZ as well as herself. She stated that MORALES-PEREZ lived in the TARGET DOMICILE. She denied knowledge of the wrappings by the safe.

Based on the above facts, combined with those related to the January 25, 2023 incident, the Honorable Giselle López-Soler issued a search warrant at 12:42PM on August 15, 2023, authorizing the ATF agents to search the defendant's Residence (the "First Search Warrant"). (*See* Crim. No. 23-mj-876). As a result of the execution of that First Search Warrant, several cell phones and electronic devices were seized from defendant's Residence (the "Electronic Devices").

## F. The second warrant issued to search the contents of the Electronic Devices

On September 19, 2023, several weeks after executing the First Search Warrant, Agent Jiménez requested a second warrant to search the contents of the Electronic Devices. The Electronic Devices subject to search were the following:

a.    One gray iPhone 14 Pro cellphone, with a clear protective case.

b.    One pink iPhone cellphone with a broken screen and broken back, SIM Card: 89014103273171409794, IMEI: 357262097569623.

c.    One grey and black PCD cellphone, model P50, SIM Card: 8901101212247236441, IMEI: 359363331315373.

d.    One AT&T SIM card #89014104270745904218.

e.    One Samsung Micro SD Card# MBMB1GMAAA-N2.

f.    One San Disk Ultra Plus 64 Micro SD card #7351DUCJA2CD.

g.    One LOREX Fusion 4K 8-channel Wired DVR System, model number D881A8B-Z.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 15 of 46

*United States v. Fedwin Morales-Pérez*                                              Page 15
Crim. No. 23-300 (FAB-MDM)

After being presented with the same probable cause as in the First Search Warrant, the undersigned magistrate judge authorized a warrant to search the Electronic Devices (the "Second Search Warrant"). [11], [12]. *See* Docket No. 65-5.

## II.    LEGAL DISCUSSION

### A. The defendant failed to meet his initial threshold burden of demonstrating that he 1) had a right to an evidentiary hearing or 2) had standing to challenge the seizure of the contraband abandoned on January 25, 2023

The defendant's first contention in his Motion to Suppress is that law enforcement agents illegally searched and subsequently seized the multiple firearms, ammunition, U.S. Currency, and white powder used as a cutting agent for controlled substances that were recovered as a result of the police pursuit on

---

[11] During the evidentiary hearing, Counsel for the government argued that the defendant was "bypassing th[e] second search warrant saying [that] if I can't have the first one then the second one must go, and that does not necessarily follow. The search warrants are separate, they're not identical. So[,] they would have to challenge both search warrants." After comparing sentence by sentence the First and Second Search Warrants, I note that the probable cause submitted for each is substantively and materially identical. The Court's ruling as to legality of one search warrant would therefore apply as to the legality of both.

[12] The fact that the undersigned magistrate judge authorized the Second Search Warrant, and is now being asked to review its legality, raises the specter of whether I must recuse myself from handling this matter. This issue was discussed in great detail during the evidentiary hearing and both Counsel for the defendant and Counsel for the government agreed that it was *not* necessary for the undersigned to recuse himself from handling this matter, from conducting the evidentiary hearing or from issuing a Report and Recommendation in this case. Regarding the specific question of recusal, Counsel for the defendant stated as follows:

> MR. SUEIRO-ÁLVAREZ: Your Honor, if I may, we know that you signed the second search warrant, not the first one. I believe they are related, but the determination of the first warrant is a separate issue. It was signed by Magistrate Judge López-Soler. And we identified this issue, but looking at the case law it basically says that there's no reason that you would have to recuse yourself. And that's why we didn't pursue the matter. We believe that -- the case law says that you are capable of holding this hearing.

Counsel for the government agreed with that position and stated the following:

> MR. RIVERA-DÍAZ: Yes, Your Honor. We don't believe Your Honor would have to recuse himself from this.

The Court finds that there is no need for the undersigned to recuse himself from these proceedings and that the parties have waived any argument to the contrary.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 16 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 16
Crim. No. 23-300 (FAB-MDM)

January 25, 2023 (the "Abandoned Contraband"). More specifically, the defendant claims that,

> [a]ny search of a vehicle without prior approval by a judge or magistrate is *per se* unreasonable under the Fourth Amendment unless it meets one of the narrow exceptions, including to guarantee the safety of the arresting officer or to preserve evidence. Neither exception–nor any other–applies here.

Docket No. 56 at 12. In support of his contention, the defendant submits that the government has the "burden of demonstrating by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." *Id.* at 2. The government disputes the defendant's legal argument and submits that, as a threshold matter, the defendant failed to meet his burden of demonstrating that he has standing to challenge the seizure of the Abandoned Contraband.[13]

After careful analysis, the Court finds that 1) the defendant failed to demonstrate that he had a right to an evidentiary hearing with respect to his challenge to the constitutionality of the seizure of the Abandoned Contraband, and 2) he also failed to demonstrate that he had standing to challenge that evidence. The Court explains.

### 1. The defendant failed to allege facts sufficient to establish an entitlement to an evidentiary hearing regarding the seizure of the Abandoned Contraband

In his Motion to Suppress, the defendant requested an evidentiary hearing related to his constitutional attack on the seizure of both the Abandoned Contraband, as well as the evidence seized from his Residence on August 15, 2023. After hearing oral argument from counsel at the start of the evidentiary hearing, the Court limited the scope of the testimony to be given during the hearing to evidence related to the search conducted on defendant's Residence on August 15, 2023. Docket No. 82

---

[13] The right to an evidentiary hearing was not specifically discussed by the parties in their respective motions, but because the Court limited the scope of the evidence defendant could present during the hearing, the issue has become more relevant.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 17 of 46

*United States v. Fedwin Morales-Pérez*                                              Page 17
Crim. No. 23-300 (FAB-MDM)

at 57-58 (discussion regarding the blue Toyota Corolla) and 67-69 (discussion regarding the black and orange rifle and the orange backpack). More specifically, the Court found that defendant had failed to meet his initial threshold burden of demonstrating that he had a right to a hearing with respect to the facts surrounding the seizure of the Abandoned Contraband.

"[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." *United States v. Lewis*, 40 F.3d 1325, 1333 (1994) (quoting *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990)) (citations omitted). Evidentiary hearings on motions to suppress are required only when a defendant makes a sufficient showing that a warrantless search has occurred. *Lewis*, at 1333 (citing *United States v. Migely*, 596 F.2d 511, 513 (1st Cir.)). To make this showing "[t]he defendant must allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" *Id.* (quoting *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir.). The defendant must allege facts that, if proven, would entitle him to relief. *Migely*, 596 F.2d at 513.

In this case, the defendant's Motion to Suppress was not accompanied by an affidavit alleging facts sufficiently definite, specific, detailed, and nonconjectural to enable the Court to conclude that a substantial claim was presented as to any of the evidence seized. *See United States v. Lewis*, 40 F.3d 1325, 1332 (1st Cir. 1994). After the government highlighted defendant's lack of standing to attack the seizure of any of the evidence in the case in its Opposition to the Motion to Suppress (*see* Docket No. 56), the defendant filed a *Motion Supplementing the Motion to Suppress. See* Docket No. 66. In his Motion Supplementing the Motion to Suppress, the defendant submitted two unsworn statements under penalty of perjury. The unsworn statements did not, however, satisfy his burden as to the Abandoned Contraband.

The first unsworn statement was given by the defendant's mother, Ms. Nitza Pérez. Ms. Pérez's unsworn statement was not prepared for the purpose of supporting the Motion to Suppress as such, but rather had been originally filed to buttress defendant's *Motion to Reopen Detention Hearing Before Magistrate Judge*.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 18 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 18
Crim. No. 23-300 (FAB-MDM)

*See* Docket No. 37. In that unsworn statement, Ms. Pérez explained (1) that the Residence where the defendant was arrested on August 15, 2023 belongs to the estate of the defendant's late father, (2) that all the members of the estate know that the defendant lives there, and (3) that the defendant has been the only tenant living in the Residence since 2014. *See* Docket No. 37-1. Importantly, Ms. Pérez's unsworn statement did not mention the blue Toyota Corolla, nor did it mention anything about the Abandoned Contraband.

The second unsworn statement was given by the defendant and it largely reiterated that which his mother stated in her unsworn statement regarding the defendant's ownership, possession and use of the Residence. Like his mother's unsworn statement, the defendant's unsworn statement failed to mention the blue Toyota Corolla, or any of the Abandoned Contraband.[14] Simply put, the two unsworn statements were silent as to the ownership or control of the blue Toyota Corolla or the Abandoned Contraband seized on January 25, 2023.

In sum, the affidavits submitted in support of defendant's motion to suppress did not challenge or controvert the proffer of facts in the Government's Response to Defendant's Motion to Suppress regarding the seizure of the Abandoned Contraband that resulted from defendant's efforts to flee from PRPB agents during the pursuit. The affidavits did not challenge the facts that (1) the defendant abandoned the blue Toyota Corolla before running into the woods carrying the black and orange rifle and the orange backpack, (2) the defendant abandoned the black and orange rifle and the orange backpack in the woods as he fled, and (3) the blue Toyota Corolla was registered to someone else who disclaimed ownership but who nevertheless gave PRPB agents consent to search the vehicle. Accordingly, in his motion to suppress the

---

[14] Importantly, the defendant's unsworn statement was signed on May 13, 2024, the same day the *Motion Supplementing the Motion to Suppress* was filed. Unlike Ms. Pérez's unsworn statement, which was recycled from another motion submitted many months prior, that is on January 4, 2024, and reused for an entirely different purpose, the defendant's unsworn statement was prepared to address and satisfy the allegations in the *Motion Supplementing the Motion to Suppress*. The defendant had an express opportunity to submit facts in his unsworn statement that would demonstrate a right to a hearing, but his submission did not satisfy the standing requirements as to the Abandoned Contraband. He did not allege ownership or control of the blue Toyota Corolla or of the Abandoned Contraband.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 19 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 19
Crim. No. 23-300 (FAB-MDM)

defendant did not allege facts that were sufficiently definite, specific, detailed, and nonconjectural to enable the Court to conclude that a substantial claim as to the Abandoned Contraband was presented.

In this case, to establish a right to an evidentiary hearing regarding the seizure of the Abandoned Contraband the defendant was required to allege facts that demonstrated how the seizure of the Abandoned Contraband violated the Fourth Amendment. He alleged none. In fact, when given the opportunity to bolster the record with his own unsworn statement alleging facts necessary to convince the Court that a substantial claim had been presented, the defendant chose to remain silent. Indeed, all he did in his Motion Supplementing the Motion to Suppress was reiterate a legal argument that he had raised previously in his Motion to Suppress, namely that it is the government who has "the burden of demonstrating by a preponderance of the evidence that [defendant's] voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." *Id.* at 2.

Counsel's legal argument, however, cannot substitute for facts supported by first-hand knowledge of the relevant events. Indeed, defendant's legal argument is akin to putting the cart before the horse and suggests that the respective burdens are opposite of what the law requires. The government's burden is not triggered unless and until the defendant has met his burden of alleging facts sufficiently definite, specific, detailed and nonconjectural to enable the Court to conclude that a substantial claim is presented with respect to the seizure of the Abandoned Contraband. The defendant alleged no facts in the submitted affidavits that would support an allegation of ownership or control of the blue Toyota Corolla or the Abandoned Contraband nor that would contradict the evidentiary proffer submitted by the Government regarding how the January 25, 2023, interaction between the defendant and the PRPB agents unfolded.

Because the defendant did not meet his threshold burden, he was not entitled to an evidentiary hearing related to seizure of the Abandoned Contraband. Thus, the Court refused to hold an evidentiary hearing because the factual matters establishing

Case 3:23-cr-00300-FAB-MDM   Document 115   Filed 06/30/25   Page 20 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 20
Crim. No. 23-300 (FAB-MDM)

that the evidence seized on January 25, 2023, had been abandoned by the defendant during his efforts to evade detention by PRPB agents were uncontested. *See Lewis*, 40 F.3d at 1332.

### 2.  *Defendant lacks standing to challenge the constitutionality of the search and the seizure of the Abandoned Contraband*

It is well-settled that before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized. *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988) (citing *United States v. Salvucci*, 448 U.S. 83 (1990). This burden, *which rests squarely on the defendant*, must be carried at the time of the pretrial hearing and on the record compiled at that hearing. *Aguirre,* 839 F.2d at 856 (citing *United States v. Gómez*, 770 F.2d 251, 253 (1st Cir. 1985)) (emphasis added). *See* Fed. R. Crim. P. 12(b)(3). Unless and until the "standing" threshold is crossed, the *bona fides* of the search and seizure are not put legitimately into issue. *Aguirre*, at 856. Indeed, the First Circuit explained in *Aguirre* that "the better practice is to  refrain from reaching the merits of a challenged search and seizure unless the movant has succeeded in crossing the standing threshold." *Id.* at 859.

To establish standing, a defendant "must show that he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (citing *California v. Greenwood*, 486 U.S. 35 (1988)). In *Aguirre*, the First Circuit was faced with a question of whether the insertion of a key into the lock of an apartment constituted a search. *Id.* The court declined to decide the issue finding that no expectation of privacy had been established. *Id.*

In cases dealing with the search of a vehicle, for example, a defendant must demonstrate ownership, possession, or control of the vehicle as a preliminary step in establishing a reasonable expectation of privacy. A mere brief association with the vehicle is not sufficient to establish a reasonable expectation of privacy. *United States v. Payne*, 119 F.3d 637, 641 (8th Cir). *United States v. Malady*, 209 F. App'x 848, 851

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 21 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 21
Crim. No. 23-300 (FAB-MDM)

(10th Cir. 2006) ("It is well established that a defendant does not have any legitimate expectation of privacy in a stolen vehicle or its contents."). *United States v. Ghazaryan*, 685 F. App'x 222, 223 (4th Cir. 2017) ("An occupant of a stolen vehicle cannot claim a legitimate expectation of privacy in either the vehicle or containers found in that vehicle.")

Consistent with that premise, the First Circuit has catalogued the following list of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched, or the things seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. *Aguirre*, at 856-57; *See, e.g.*, *United States v. Gómez*, 770 F.2d 251, 254 (1st Cir. 1985); *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir. 1982).

In this case, the defendant's failure to swear out an affidavit in support of his Motion to Suppress necessarily means that he has failed to assert any privacy interest in the Abandoned Contraband. Though he may have thought that claiming such an interest might prejudice him at trial, "it has been well settled for over [fifty (50) years] that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." *Lewis*, at 1333 (quoting *United States v. García–Rosa*, 876 F.2d 209, 219 (1st Cir. 1989) (citing *Simmons v. United States*, 390 U.S. 377, 390 (1968)). Nevertheless, no matter the reason for defendant choosing not to submit an unsworn statement claiming an ownership interest over the Abandoned Contraband, he clearly appears uninterested or unwilling to associate himself with any of the Abandoned Contraband. Given that reality, he cannot avail himself of the protection of the exclusionary rule absent any alleged connection with those items. Hence, he has failed to show a reasonable expectation of privacy. *See Lewis*, at 1333 (finding defendants lacked standing to protest the police officers' search of the parking lot because they failed to assert any privacy interest in the seized contraband. Neither defendant personally swore out any affidavits with respect to having an expectation of privacy over the seized items).

The Court finds, therefore, that having failed to make such a showing, the defendant does not have standing to challenge the constitutionality of the seizure of the Abandoned Contraband.[15]

## B. Protective sweeps as an exception to warrantless searches

### 1. *Protective sweeps require reasonable articulable suspicion of imminent danger*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United States v. Delgado Pérez*, 867 F.3d 244 (1st Cir. 2017). U.S. Const. amend. IV. The Supreme Court has long held that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Delgado Pérez*, at 251 (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation marks and citation omitted). "Because the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies." *Delgado Pérez*, at 251 (quoting *United States v. Infante*, 701 F.3d 386, 392 (1st Cir. 2012) (quotation marks and citation omitted); *see also Payton*, 445 U.S. at 586.

One of those exceptions is a protective sweep. The Supreme Court has described a protective sweep as "a quick and limited search of premises," usually incident to an arrest, that is "conducted to protect the safety of police officers or others" at the scene. *United States v. Hernández-Mieses*, 931 F.3d 134, 141 (1st Cir. 2019) (*quoting Maryland v. Buie*, 494 U.S. 325, 327 (1990)).

---

[15] Although the Court denies the Motion to Suppress as it relates to the Abandoned Contraband based on a finding that the defendant lacks standing to raise a Fourth Amendment challenge as to those items, I also note that, in any event, the search and seizure of the Abandoned Contraband satisfied the Fourth Amendment under the doctrines of abandonment and plain view. "When a defendant abandons property before a 'seizure' occurs, the Fourth Amendment is not implicated because the property is not the fruit of an illegal search and seizure." *Lewis*, 40 F.3d at 1334. Likewise, "[t]he 'plain view' doctrine allows the police to seize evidence without a warrant so long as (1) the evidence is in 'plain view,' (2) the police are legitimately on the premises where the evidence is seized, and (3) the evidence is immediately and apparently connected to the criminal activity." *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73 (1971)). The defendant does not contest that he abandoned the items on January 25, 2023, before absconding from PRPB agents nor that some or all of the items were in plain view when the PRPB agents seized the same.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 23 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 23
Crim. No. 23-300 (FAB-MDM)

For law enforcement to justify a protective sweep, the officers must have a "reasonable suspicion of danger," that is, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Hernández Mieses*, at 141 (quoting *Buie*, at 334). "[A] mere 'inchoate and unparticularized suspicion or hunch'" that someone is hiding who could pose a danger to the arresting officers is not enough to support a protective sweep. *Hernández Mieses*, at 141 (quoting *Buie*, at 332) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from an attack by a third party during the arrest, not the dangerousness of the arrested individual. *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996); *see also United States v, Archibald*, 589 F.3d 289, 298-99 (6th Cir. 2009).

But the reasonable suspicion standard "is considerably less demanding than the level of proof required to support a finding of probable cause." *United States v. Winston*, 444 F.3d at 118. And courts are ordinarily hesitant to second-guess an officer's determination that a protective sweep is necessary: "the experienced perceptions of law enforcement agents deserve deference and constitute a factor in [the] reasonable suspicion analysis." *Id.* at 119.

> **2.** *A protective sweep must be confined to a cursory visual inspection for persons potentially in hiding*

Reasonable suspicion to conduct the sweep, however, is just one part of the analysis. A protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Hernández Mieses*, at 141 (quoting *Buie*, 494 U.S. at 327; *see also United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (assuming that a protective sweep would not allow looking inside a cabinet "too small to accommodate a person"). *Hernández Mieses*, at 141-42. And, of crucial importance in this case, a protective sweep must be limited in duration and "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 24 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 24
Crim. No. 23-300 (FAB-MDM)

*Hernández Mieses*, at 142 (quoting *Buie*, 494 U.S. at 335-36). It is the government's burden to demonstrate the legitimacy of the search. *Hernández Mieses*, at 139 (quoting *United States v. Winston*, 444 F.3d 115, 123-24 (1st Cir. 2006). *See also Delgado Pérez*, 867 F.3d at 250.

### C. The ATF agents lacked reasonable articulable suspicion of danger to justify a protective sweep of defendant's Residence after his arrest outside the home

The defendant challenges the seizure of the green aluminum foil wrappers found in the Residence on August 15, 2023, arguing that their seizure was illegal because it resulted from an unjustified protective sweep conducted by ATF agents after his arrest outside his Residence. He contends that the sweep lacked reasonable, articulable suspicion that anyone posing a danger could be found inside the Residence. And since the green aluminum foil wrappers were discovered during the allegedly unlawful sweep, he asserts that the wrappers should be suppressed. Then, once suppressed, they cannot be used to support probable cause for either the First or the Second Search Warrants. He argues that without that evidence, both warrants would lack probable cause and therefore any evidence derived therefrom should be suppressed. *See generally*, *United States v. Dessessure*, 429 F.3d 359, 367 (1st Cir. 2005).

The government, on the other hand, argues that the protective sweep of the Residence after his arrest *was* "based on [reasonable] articulable facts, which taken together with the rational inferences from those facts[,] would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Docket No. 94 at 6. (Emphasis added). In support of this contention, the government references the following facts from the record:

    1.   The defendant is a highly dangerous person who is suspected of being involved in several murders.

    2.   On January 25, 2023, the defendant was heavily armed and found to be in possession of three (3) machineguns.

    3.   On January 25, 2023, the defendant fled the scene and engaged in a foot pursuit with police.

4.   The defendant is suspected of being the number two person in command of a drug trafficking organization.

5.   Agent Cavender testified that "[a] lot of these drug trafficking organizations that we've encountered they'll have other people spending the night with them even if it's not somebody that lives there all the time. It may be a random night where somebody spends the night with them." Docket No. 82 at 98.

6.   Surveillance revealed that defendant's Residence was a concrete structure with metal doors and had multiple security cameras.

7.   On at least two of the days that agents were conducting surveillance their cover appears to have been burned by residents in the neighborhood.

8.   On the second day of surveillance, the defendant was seen stepping out of his house "looking at the surrounding area and recording with his cell phone while pretending to pick up the mail."

9.   On the third day of surveillance, the defendant was seen speeding out of his home on a motorbike wearing a "balaclava-type" face mask.

10.  Defendant was not alone at the residence at the time of his arrest.

11.  A ten-year-old child was missing at the time of the protective sweep.

12.  When agents arrived at defendant's home, he ran into the house briefly and exited thirty (30) seconds later with his hand's raised.

The government further contends that the search was constitutionally valid because, while lawfully inside the defendant's home for a protective sweep, agents observed the green aluminum foil wrappers in plain view.

The Court finds, based on the record before it, that the protective sweep was unlawful for lack of reasonable articulable suspicion of dangerousness from a third party in the Residence and, therefore, the green aluminum foil wrappers, which were seized as a result of the protective sweep, should be suppressed. The Court explains its reasoning further below.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 26 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 26
Crim. No. 23-300 (FAB-MDM)

>    1.  *Defendant's own dangerousness did not create reasonable articulable*
>        *suspicion of dangerousness from a third party in the Residence*

The first argument raised by the government in support of its contention that there was reasonable articulable suspicion to believe that the Residence harbored an individual posing a danger to those on the arrest scene has to do with the defendant's overall dangerousness. More specifically, the government contends (1) that the defendant is a highly dangerous person who is suspected of being involved in several murders; (2) that on January 25, 2023, he was heavily armed and in possession of three machineguns; and (3) that on January 25, 2023, the defendant fled the scene and engaged in a foot pursuit with police. These facts, however, are not appropriate to consider when determining whether the arresting officers reasonably believed that someone else inside the Residence might pose a danger to them. *See Colbert*, 76 F.3d at 777.

Here, the defendant was already in custody outside the Residence before the protective sweep had begun. Indeed, by the time the SRT Team breached the front door, the defendant was already in handcuffs and was being escorted away from the scene. Not only did he pose little or no threat to the arresting officers at that time, but, as the Court has already explained, the defendant's dangerousness is not germane to the inquiry into whether the police may conduct a protective sweep in response to a reasonable suspicion of a threat from *some other person* inside the home.[16] *Id.* at 776 (citing *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (explaining that the threat posed by an individual already in custody does not justify a protective sweep). *See also Archibald*, 589 F.3d. at 299. If district courts were allowed to justify protective sweeps based on the dangerousness of the arrestee,

---

[16] Though the government does not specifically argue the possibility of there being firearms in the Residence as grounds for conducting the protective sweep, the evidence shared with the Court clearly shows that the last time the defendant was seen with firearms was as far back as January 25, 2023. Those firearms were all recovered by law enforcement during the pursuit with police and that evidence demonstrates that the defendant took great pains to store the firearms outside of his Residence. Therefore, all the evidence presented to the Court points towards there being no expectation of defendant having any firearms stored inside the Residence.

nearly every arrest taking place in or near a home would include a protective sweep. *Colbert*, at 776.

In sum, the Court does not find that the first three grounds cited by the government having to do with defendant's dangerousness support the contention that there was reasonable articulable suspicion to justify a protective sweep of the Residence after his arrest outside the home.

> **2.** *Defendant's role as a member of a drug trafficking organization alone does not support reasonable articulable suspicion that coconspirators would be lying in wait at his Residence*

The government next argues that there was reasonable articulable suspicion to believe that the Residence harbored an individual posing a danger to those on the arrest scene because (4) the defendant is suspected of being the number two person in command of a drug trafficking organization; and (5) "[a] lot of these drug trafficking organizations [will] have other people spending the night with them even if it's not somebody that lives there all the time." Docket No. 82 at 98. In this case, these two factors are insufficient to support the contention that a dangerous person was likely to have been lying in wait in the Residence threatening to cause harm to the agents during the arrest.

In *Delgado Pérez*, a case with a similar fact pattern to this one, the First Circuit found the argument that dangerous persons might be present at a residence solely because the arrestee was a known drug trafficker to be wholly unpersuasive. *Delgado Pérez*, 867 F.3d at 254.[17] The First Circuit noted that,

---

[17] In *Delgado-Pérez* at least a dozen law enforcement officers arrived at Delgado's residence in Puerto Rico with a New York state arrest warrant for trafficking cocaine through the United States mail. When the officers arrived outside Delgado's residence and announced their presence, there was initially no response. The officers began to open a rebar gate outside the residence, at which point Delgado opened a window and told the officers, through the window, that he was home and was going to open the door. Delgado retrieved a key, came outside, opened the rebar gate for the officers and identified himself to the officers. *Delgado-Pérez*, 867 F.3d at 247-48. Once Delgado was outside, the officers conducted a protective sweep of the residence, which, according to one officer, was a standard practice to ensure officer safety and prevent destruction of evidence. An officer also testified that, while Delgado told the officers there was no one else present in the home, the officers did not take his word for it and "had to verify that there was no one else in the residence who could harm them." The agents knew that Delgado was a convicted felon and drug trafficker, and that "drug trafficking goes hand in hand with weapons." There were security cameras that would allow someone inside the house to watch

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 28 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 28
Crim. No. 23-300 (FAB-MDM)

> [w]e have never held that because the person arrested is
> sought for drug trafficking, it is reasonable to suspect for
> that reason alone that there may be another person in the
> home who poses a danger to officer safety. And we do not
> see why such a conclusion is reasonable here, when
> Delgado was arrested in Puerto Rico on a New York
> warrant and the government points to no evidence of a link
> between Delgado's alleged drug dealing and the presence
> of confederates in Puerto Rico, let alone a link that would
> suggest any such local confederate would have been at
> Delgado's residence between 4:30 and 5:00 A.M.
> *See Archibald*, 589 F.3d at 299 (noting that the particular
> arrest warrant at issue "did not raise concerns that an
> accomplice might be present in [the defendant's]
> apartment at the time of his arrest"); *see also United States
> v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004)
> (rejecting the contention that "agents had a reasonable
> belief that other people might be in the motel room due to
> their suspicion that [the defendant] was a drug courier,
> their experience that drug couriers often meet up with
> their contacts, and their awareness that drug traffickers
> are frequently armed and dangerous" when "[n]o facts
> specific to this case support[ed] [such] a finding").

*Id.* (Internal footnote omitted).

As in *Delgado Pérez,* no facts specific to this case support a finding that defendant's known drug trafficking activities created a reasonable articulable suspicion that there might have been another person in the Residence who posed a danger to officer safety. To the contrary, the extensive surveillance conducted by ATF agents in preparation for execution of the arrest dispelled any such suspicions. The record indicates that on August 9, 2023, TFO Alcoba and a fellow agent spent approximately 8 hours, from 5:40AM-2:00PM, conducting surveillance at the Residence. On August 10, 2023, TFO Vega and a fellow agent spent approximately 5 hours, from 6:10AM-11:00AM, conducting surveillance at the site. On August 11, 2023, TFO Alcoba and a fellow agent spent another approximately 5.5 hours, from 5:30AM-11:00AM, conducting surveillance. And finally on August 14, the day before

---

the movements of the officers, and the configuration of Delgado's house included an apartment on the premises and a locked rebar fence and gate outside of the house. *Id.*

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 29 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 29
Crim. No. 23-300 (FAB-MDM)

the execution of the Arrest Warrant, Agent Cavender and a fellow SRT member spent approximately 2 hours, from 5:00AM-7:00AM conducting surveillance. During these approximately 20 hours of surveillance of the Residence no known associates of the defendant were seen at the Residence. Furthermore, the record demonstrates that defendant went to great pains to keep his firearms outside the home— instead storing these "tools of the trade" in the woods nearby.

Accordingly, in this case, Agent Cavender's testimony to the effect that "[a] lot of these drug trafficking organizations that we've encountered they'll have other people spending the night with them even if it's not somebody that lives there all the time. It may be a random night where somebody spends the night with them," results in nothing other than unsupported speculation. Such generalizations, without more, are simply insufficient to justify a protective sweep. *See Moran Vargas*, 376 F.3d at 116. (citing *United States v. Taylor*, 248 F.3d 506, 514 (6th Cir. 2001) (generalized suspicion that defendant was a drug dealer was inadequate, standing alone, to justify protective sweep)); cf. *Buie*, 494 U.S. at 334 n.2 (noting that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, . . . reasonable, individualized suspicion [is required] before a [protective sweep] can be conducted").

Similarly, the lack of information, i.e., not knowing if someone is sleeping over, cannot provide an articulable basis upon which to justify a protective sweep. *Moran Vargas,* 376 F.3d at 117; s*ee also United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (the court found illegal a warehouse search conducted forty-five minutes after an arrest and the officers had no information about what was inside the warehouse. The court held that "in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was

inside the warehouse, the officers' lack of information cannot justify [a] warrantless sweep.").

In short, the Defendant's purported association with a drug trafficking organization, standing alone, does not give rise to a reasonable, articulable suspicion that co-conspirators would be lying in wait at his Residence.

### 3. *The Residence's construction materials and security features alone did not create a suspicion of dangerousness from a third party lying in wait*

The government also attempts to justify the protective sweep by noting (6) that the Residence was a concrete structure with metal doors and had multiple security cameras. The government contends, albeit without any explanation in its post-hearing brief, that these characteristics of defendant's home somehow supported a reasonable belief that a dangerous individual would likely be found in the Residence waiting for the opportunity to cause harm to the arresting agents.

In *Delgado Pérez*, the First Circuit was also unmoved by the identical argument. The Court noted that:

> As for the gate and rebar fence, neither is a particularly uncommon residential feature. Nor does the record suggest otherwise. We thus fail to see how either feature, even when considered along with the facts already mentioned, provides a basis for reasonably suspecting that someone besides Delgado was in the house who could pose a threat to the officers.
>
> \*    \*    \*
>
> So too do the government's arguments fail with respect to the presence of security cameras on the premises. Security cameras may better allow a person within a residence to track officers' movements outside. But we fail to see how the [camera's] presence provides officers a reason to believe that there is in fact someone else inside a residence. Nor does anything in the record indicate that there is any particular reason to believe that the presence of such cameras does indicate that someone besides the person arrested was likely to be in the home of the arrestee. Thus, the security cameras, even if considered in connection with the other residential features of the home and Delgado's ties to drug trafficking, fail to shed any light on the question, under *Buie*, whether "a reasonably prudent

> officer" was warranted "in believing that the area to be
> swept harbor[ed] an individual posing a danger to those on
> the arrest scene."

*Delgado Pérez*, 867 F.3d at 254-55.

This Court adopts the rationale articulated by the First Circuit in *Delgado Pérez* to find that no link was established between the Residence's strong construction materials, or the presence of security cameras, and a reasonable belief that at the time of the arrest the Residence was harboring someone who could cause harm to the arresting officers. Furthermore, the record developed in this case is to the contrary. The surveillance conducted of the premises by ATF agents dispelled those suspicions. No known associates of the defendant were ever seen at his Residence and he was witnessed retrieving weapons and money from a hiding place the was not the Residence.

> 4. *Allegations of countersurveillance or surreptitious conduct by the defendant was not reasonably indicative of the presence of a dangerous third party at the Residence*

The next justifications proffered by the government in support of the legality of the protective sweep relate to the agents' observations during the four days of surveillance conducted in the days leading up to the execution of the Arrest Warrant. The government contends that (7) on at least two of the days that agents were conducting surveillance, their cover appears to have been burned by residents in the neighborhood; (8) on the second day of surveillance, the defendant was seen stepping out of his house "looking at the surrounding area and recording with his cell phone while pretending to pick up the mail;" and (9) on the third day of surveillance, the defendant was seen speeding out of his home on a motorbike wearing a "balaclava-type" face mask.

None of these facts, however, support the contention that it would have been reasonable for law enforcement to believe that someone other than the defendant might be lying in wait inside the Residence ready to do harm to the arresting officers. The conduct described was performed by the defendant himself or by individuals or "neighbors" who were *not* at the Residence. Indeed, other than merely listing these

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 32 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 32
Crim. No. 23-300 (FAB-MDM)

three observations by ATF agents during their surveillance of the Residence, the government offers no explanation as to how these facts furthers an argument that a dangerous individual may be holed up *in the Residence* waiting to cause harm to agents on scene. In fact, the Court finds that the surveillance conducted over a period of four days confirms the fact that the agents had no reason to expect anyone other than the defendant, his consensual partner and her six-year-old son to be in the Residence at that hour of the day.

Moreover, the fact that it turned out that the agents' surveillance and investigation missed the potential presence of the defendant's ten-year-old son at the Residence at the time of the arrest does not somehow render the protective sweep reasonable because the agents did not learn that the ten-year-old son was in the Residence until *after* the protective sweep had already begun.[18] Therefore, the presence of the ten-year-old boy inside the Residence that morning could not have served as an affirmative justification for carrying out the protective sweep. In sum, there is no indication from the testimony given that the pre-arrest intelligence resulted in any evidence that a dangerous person might be lying in wait inside the Residence at the time of the arrest.

---

[18] Agent Cavender's direct exam testimony regarding when the agents found out about the presence of the ten-year-old boy in the Residence went as follows:

> **Agent Cavender**: At this point Mr. Morales-Pérez's girlfriend is being taken back to the minivan. And in just a second at the front door you'll see someone carrying out the small child. They're bending over and talking. They pick up the small child and take him to his mother. They place him in the minivan that I was in earlier.
>
> **Prosecutor**. I'm going to pause here for a second at minute 2 and 18 seconds. Now, briefly during your testimony you mentioned a child hiding inside the residence; is that the same child that came out here?
>
> **Agent Cavender**: No, sir, it's not. This six-year-old child we knew about from intelligence given to me by the case agent. *We didn't know anything about a ten-year-old child at this point.*

Docket No. 82 at 117-18. (Emphasis added).

>    5.  *The discovery of the missing ten-year-old boy after commencement of the protective sweep does not justify this warrantless search*

The government next contends (10) that the defendant was not alone at the time of his arrest and (11) that once the protective sweep began ATF agents learned that a ten-year-old child was missing. Neither of these facts provide support for the contention that a protective sweep was warranted to ascertain that there were no dangerous individuals hiding in the Residence.

To begin with, the government is silent as to how these facts are relevant to the likelihood of there being a dangerous individual, other than the defendant, inside the Residence before commencement of the protective sweep. Nevertheless, the record demonstrates that the agents fully expected the defendant not to be alone when they executed the Arrest Warrant. They knew from the surveillance that Ms. Rodríguez and her six-year-old son would be present. Moreover, the agents knew that neither Ms. Rodríguez nor her six-year-old son were going to be a threat to the arresting officers.

In addition, with respect to Ms. Rodríguez's ten-year-old son, as mentioned above, his presence was not known to the agents until after the protective sweep had already begun. Therefore, his presence could not possibly have formed a basis for determining whether a protective search was necessary. In sum, the Court finds that the defendant not being alone in the house, without more, does not provide affirmative evidence pointing to reasonable articulable suspicion that a dangerous individual was hiding inside the Residence.

>    6.  *Defendant's voluntary surrender did not create articulable facts supporting the potential presence of another dangerous individual in the Residence*

And finally, the last reason cited by the government in support of the belief that a dangerous person was holed up inside the Residence is (12) that as soon as the agents arrived on scene, the defendant hurriedly ran inside the Residence only to exit some thirty (30) seconds later and voluntarily surrender. This contention is also insufficient pursuant to the record in this case.

In *Delgado Pérez*, the defendant also voluntarily surrendered to police outside his home. The government, likewise, also argued that Delgado Perez's immediate voluntary surrender outside allowed officers to infer the presence of others lying in wait from inside the residence. *Id.* at 255. Once again discarding the government's argument as unpersuasive to support a protective sweep, the First Circuit stated that,

> *Buie* allows a protective sweep based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S. Ct. 1093 (emphasis added).

> We decline to conclude that, under *Buie*, it is rational, on this record, to infer that Delgado's voluntary surrender outside his home supports a belief that confederates were lying inside in wait. And that is so even if we take account of the other facts the government identifies in assessing the significance of the voluntary surrender. An arrestee may surrender outside for any number of reasons, including a desire to be cooperative, a fear that officers will otherwise use physical force against him or his property, or a desire to prevent the officers from entering a residence and seeing possible contraband inside.

*Delgado Pérez*, 40 F.3d at 255. Finding that nothing in the testimony presented in *Delgado Pérez* articulated that it was either unusual or suspicious that Delgado came downstairs and surrendered outside the front of the house, the Court found the protective sweep of the house unlawful. *Id.*

This Court also once again concurs with the rationale articulated in *Delgado Pérez* to find that, in this case, the defendant's voluntary surrender in the carport approximately 30 seconds after entering the Residence did not allow officers to infer the presence of others lying in wait inside the Residence. The extensive surveillance that was conducted by ATF agents over a period of four days prior to executing the Arrest Warrant provides a strong basis for this conclusion.

After spending no less than twenty (20) hours over those four days surveilling the Residence, the agents learned that the only people who resided therein were the

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 35 of 46

*United States v. Fedwin Morales-Pérez*                                        Page 35
Crim. No. 23-300 (FAB-MDM)

defendant, his then consensual partner Ms. Rodríguez, and her six-year-old child. During those four days of surveillance, the agents developed no information that would indicate that either Ms. Rodríguez or her six year-old son were dangerous in any way or posed a threat to the arresting officers. Indeed, over those four days of surveillance, no one was seen at the Residence engaging in any criminal conduct, nor was anyone seen with any firearms or drugs. Additionally, though the government submitted that the defendant was the number two in command of a drug trafficking organization, not a single associate of the defendant was seen visiting the house and he was observed hiding his firearms outside the home. Furthermore, no one unexpected was seen "sleeping over" at the Residence and the agents did not observe any unusual or unexpected vehicles parked in front of the Residence on any of the days of surveillance or on the day of the arrest.

The Court notes that there could be many reasons for which an individual might retreat into the house upon seeing multiple unknown vehicles approach with individuals dressed in fatigues carrying military-style rifles—the most obvious of which is fear. Nevertheless, the fact of the matter is that the government carries the burden to demonstrate the legitimacy of a resulting protective sweep based on a rational inference from these facts and here it has failed to do so. The government has not provided any explanation as to why in this case the defendant's retreat into the Residence for 30 seconds would allow the officers to infer the presence of confederates lying in wait inside. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Moreover, no witness testified that the defendant's retreat into the house caused the agents to believe that there was someone hiding inside.

In sum, notwithstanding the government's list of 12 facts that it claims support its argument, the Court finds that it has failed to meet its burden to demonstrate that there were reasonable articulable facts–even when considered as a whole–supporting a reasonable suspicion that another individual laid in wait inside the Residence. To be sure, the "[l]ack of information cannot provide an articulable basis upon which

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 36 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 36
Crim. No. 23-300 (FAB-MDM)

to justify a protective sweep." *Delgado Pérez*, 40 F.3d at 256 (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996)). While "there could always be a dangerous person concealed within a structure[,] . . . that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*." *Delgado Pérez*, 40 F.3d at at 256 (citing *United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004)). The Court therefore finds that the protective sweep conducted in this case was unjustified and unlawful. As a result, the agents lacked legal justification to be present inside the Residence to discover the green aluminum foil wrappers that were lying on top of a counter in the bedroom.

### D. The protective sweep had concluded prior to Agent Cavender discovering the green aluminum foil wrappers

The Court notes that, even if the protective sweep had been lawful and justified from the outset, the green aluminum foil wrappers would still be suppressed because they were illegally seized.

As mentioned above, a protective sweep must be limited in scope to "a cursory visual inspection of those places in which a person might be hiding." *Hernández Mieses*, 931 F.3d at 141 (quoting *Buie*, 494 U.S. at 327; *see also United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (assuming that a protective sweep would not allow looking inside a cabinet "too small to accommodate a person"). *Id.* at 141-42. In addition, a protective sweep must be limited in duration and "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 142 (quoting *Buie*, 494 U.S. at 335-36).

In this case, the Court finds that the protective sweep had concluded before a narrower, more exhaustive search was conducted for the missing ten-year-old boy. As explained by Agent Cavender during the hearing, after the SRT Team breached the front door of the Residence, a protective sweep commenced with a visual inspection conducted by a drone that was sent through the house to make sure there were no immediate threats to the breaching agents. The security camera video shows

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 37 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 37
Crim. No. 23-300 (FAB-MDM)

the drone entering the house at 6:29:25AM, followed by six SRT agents who entered the house at precisely 6:30:40AM. Approximately one minute later, a K-9 trained to identify the presence of human beings and his handler entered the house to join the protective sweep. One minute after the K-9 entered the house, the drone is seen exiting through the front door.

When questioned about the specifics of the protective sweep, Agent Cavender explained that his agents "went into every room in the residence initially doing a, you know, protective sweep, clearing the room for people." Docket No. 82 at 97-98. After completing a cursory visual inspection of those places in which a person might be hiding, the ATF agents approached Agent Cavender and indicated that "they hadn't found anybody." *Id.*

It was then that Agent Cavender, having heard over the radio that a ten-year-old boy was in the house and had not yet been located, *"told everyone to conduct a second check* to make sure that because if [they] had missed a ten-year-old boy [he] didn't know who else [they] might have potentially missed." *Id.* (Emphasis added). This was when he and the others "began checking every room" and when he personally walked into the bedroom at the back of the residence, "looked through the room, about chest high, [and he] saw a counter that had a plastic bag containing green aluminum foil that was consistent with narcotics packaging." He said he made a mental note of this discovery, and "continued searching the room, walk[ing] through all the rooms to make sure that all of the SRT members were searching all of the rooms well, conducting good searches, *searching every little nook and cranny* so that we could find any potential people in there and find the ten-year-old child, to make sure that he was okay." Docket No. 82 at 99-100. (Emphasis added).

Agent Cavender explained that as part of this more exhaustive search his agents "looked under the bed, they had moved the bed, they had moved the mattress and had never detected him in there 'cause he's – he's ten years old, he's kind of slim." The boy was eventually found hiding underneath a blanket on the bed curled up into a little ball. At 6:35:39AM, the boy exited the house through the front door. Docket No. 82 at 100-01.

This second more exhaustive search, instigated by the agents' search for the Ms. Rodríguez's and the defendant's ten-year-old son, however, was wholly outside the scope of a protective sweep. As previously explained, a protective sweep must be narrowly confined to a cursory visual inspection of those places in which a person might be hiding. It must be limited in duration and last no longer than necessary to dispel the reasonable suspicion of danger from a person lying in wait. It should extend no longer than it takes to complete the arrest and depart the premises. *Hernández Mieses*, 931 F.3d at 142 (quoting *Buie*, 494 U.S. at 335-36). After sending in the drone, six agents and the K-9 with his handler, who informed Agent Cavender that no one was found, the protective sweep concluded. The permissible cursory visual inspection was completed before Agent Cavender gave the order to do a second search for the ten-year-old boy.

The Court also finds, and the government does not argue to the contrary, that in this case the defendant's missing ten-year-old son was not a potential danger to the arresting officers and that their search for him was not conducted out of a concern for officer safety. Therefore, the agents second more exhaustive search exceeded the scope of the protective sweep exception to the prohibition against warrantless searches.

Moreover, the Court is unconvinced by the contention that if the agents missed the ten-year-old boy, they might have missed a dangerous individual lying in wait. Based on the totality of the circumstances, there is no indication in the record that there was any chance of there being a dangerous individual lying in wait. Therefore, the "second check" ordered by Agent Cavender was for the sole purpose of locating the ten-year-old boy. Absent an emergency situation, which has not been alleged here, there is simply no applicable exception to the warrant requirement to allow for an extension of the protective sweep to search for the ten-year-old boy.[19]

---

[19] If there had been an emergency situation that required the agents to find the ten-year-old boy, they could have relied on the "Emergency Aid Doctrine," which provides that, in an emergency situation, the police may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm. *United States v. Martins*, 413 F.3d 139, 147 (1st Cir. 2005).

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 39 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 39
Crim. No. 23-300 (FAB-MDM)

To be sure, however, the Court does not fault the good faith intentions of the agents to locate the ten-year-old boy and secure his safety before departing the premises. However, once the scope of the search changed from a constitutionally permissible sweep for dangerous individuals to an exhaustive search for a ten-year-old boy, the government's desire to look for, or perhaps stumble upon, incriminating evidence has to take a back seat to the protections afforded by the Fourth Amendment. In this case, those protections did not give the agents the authority to linger over the premises and gather evidence, whether intentional or not, until the ten-year-old boy was found.

Recognizing that police officers have an incredibly difficult and dangerous task and are often placed in life threatening situations, in *Colbert* the Sixth Circuit expressed itself in a way wholly relevant to the facts of this case. The court in *Colbert* stated that,

> [i]t would perhaps reduce the danger inherent in the job if we allowed the police to do whatever they felt necessary, whenever they needed to do it, in whatever manner required, in every situation in which they must act. However, there is a Fourth Amendment to the Constitution which necessarily forecloses this possibility. As long as it is in existence, police must carry out their often dangerous duties according to certain prescribed procedures, one of which has been transgressed here.

*Colbert*, 76 F.3d at 778. Therefore, even if the protective sweep were found to be legal and justifiable, the green aluminum foil wrappers discovered during the unauthorized secondary search must be suppressed.

### E. The good-faith exception applies to the execution of searches pursuant to the First and Second Search Warrants

Having found that the green aluminum foil wrappers should be suppressed, either because the protective sweep was unlawful due to a lack of reasonable articulable suspicion, or because they were discovered during an unauthorized secondary search of the Residence, the Court now addresses the defendant's attack on the probable cause used to justify the issuance of the First and Second Search Warrants. The defendant contends that because the green aluminum foil wrappers

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 40 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 40
Crim. No. 23-300 (FAB-MDM)

were illegally seized, the Court should follow the dictates of *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005). Pursuant to *Dessesaure,* the defendant submits that the Court should excise the offending information from the affidavits in support of the applications for the First and Second Search Warrants, namely the seizure of the green aluminum foil wrappers, and determine that absent such information the remaining facts and evidence are insufficient to establish probable cause for the resulting searches. *Id.*

On the other hand, the government contends that, regardless of whether a Fourth Amendment violation occurred that would require excising information used to establish probable cause for the First and Second Search Warrants, the facts of this case demonstrate that the *Leon* good faith exception applies—and, accordingly, evidence seized pursuant to those warrants should not be suppressed. *United States v. Leon*, 468 U.S. 897 (1984).

After carefully considering the facts and the law in this case, and assessing the credibility of the witnesses, the Court finds that the good-faith exception applies to the agents' reliance on the First and Second Search Warrants and the evidence seized pursuant thereto should not be suppressed.

### 1. *The Court may bypass analysis of probable cause and proceed first with the good faith exception analysis*

The Court has the discretion to first consider the agents' good faith in applying for the warrants before tackling the defendant's *Dessesaure* argument on whether the warrants here were supported by probable cause. *United States v. González*, 113 F.4th 140, 147 (1st Cir. 2024) (citing *United States v. Robinson*, 359 F.3d 66, 69 (1st Cir. 2004) (declining to decide whether warrant was supported by probable cause and instead affirming on the ground that affiant acted in objective good faith in applying for warrant); *United States v. Beckett*, 321 F.3d 26, 32-33 & n.4 (1st Cir. 2003) (taking same approach); *United States v. Owens*, 167 F.3d 739, 744-45 (1st Cir. 1999) (recognizing that, under *Leon*, "courts have discretion to consider the issue of officers' good faith without first addressing Fourth Amendment issues"). In exercising that

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 41 of 46

*United States v. Fedwin Morales-Pérez*                                      Page 41
Crim. No. 23-300 (FAB-MDM)

discretion, the Court assumes, in defendant's favor, that probable cause did not support probable cause for the search. *Owens*, 167 F.3d at 744-45.

### 2. *Good faith reliance may exist absent probable cause*

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation" of its terms. *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017) (quoting *Leon*, 468 U.S. at 906). Nevertheless, the Supreme Court created the exclusionary rule as a "'prudential' doctrine . . . 'to compel respect for the constitutional guaranty.'" *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998); and *Elkins v. United States*, 364 U.S. 206, 217 (1960)). The exclusion of evidence obtained by an unconstitutional search is "not a personal constitutional right" but a remedy whose "sole purpose . . . is to deter future Fourth Amendment violations." *Levin*, at 321-22 (quoting *Davis*, at 236-37) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976))).

Under the exclusionary rule, courts may suppress evidence "obtained as a direct result of an illegal search or seizure" as well as evidence that is the "fruit of the poisonous tree." *Levin*, at 322 (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, due to the significant costs of suppressing evidence of crimes, the exclusionary rule applies "only . . . where its deterrence benefits outweigh its substantial social costs." *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)) (alteration in original). "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Levin*, at 322 (quoting *Davis*, 564 U.S. at 238) (quoting *Herring v. United States*, 555 U.S. 135, 143-44 (2009)). However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (internal citations and quotation marks omitted).

With these objectives in mind, the Supreme Court has delineated the bounds of the good faith exception by indicating, more specifically, that suppression is appropriate:

1. "[I]f the magistrate [judge] or [the district] judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."[20]

2. "[W]here the issuing magistrate wholly abandoned his [or her] judicial role."

3. Where the executing officer relies "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[21]

*Levin*, at 32 ((quoting *Leon*, 468 U.S. at 923) (citations omitted)) ((footnotes added to original)).

In determining whether a reasonable officer should have known that a search was illegal despite a magistrate judge's authorization, "a court must evaluate all the attendant circumstances, keeping in mind that *Leon* requires . . . objective good faith." *Levin*, at 322 (quoting *United States v. Ricciardelli*, 998 F.2d 8, 15 (1st Cir. 1993) (internal citations omitted)). It is the government who bears the "heavy burden" of showing that its officers acted with objective good faith when they relied on the search warrant. *United States v. González*, 113 F.4th 140, 149 (1st Cir. 2024) (citing *United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013)).

Based on the evidence and testimony presented, the Court finds that the government has met its burden to demonstrate that the good-faith exception applies in this case despite any deficiencies there might be in the probable cause for the First

---

[20] *See Franks v. Delaware*, 438 U.S. 154 (1978).

[21] *See United States v. Cordero-Rosario*, 786 F.3d 64, 72-73 (1st Cir. 2015). (the court found that the agent sought the warrant based solely on his own conclusory assertions and those assertions did not even assert a "nexus between the object of the search and the crime under investigation, let alone provide enough facts to establish probable cause to believe such a nexus existed." ". . . [T]he police cannot be said to be acting reasonably in relying on [such] a warrant.")

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 43 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 43
Crim. No. 23-300 (FAB-MDM)

and Second Search Warrants. *See United States v. Beckett*, 321 F.3d 26, 32 (1st Cir. 2003) (recognizing that an affidavit could be insufficient for the purpose of probable cause but sufficient for an officer to rely on in objective good faith).

To begin with, the evidence presented does not show that either of the two magistrate judges who authorized the First and Second Search Warrants were misled by information in the affidavits in support of the applications for the warrants that the affiant knew was false or would have known was false except for a reckless disregard of the truth. The affidavits accurately described the facts surrounding the protective sweep of the Residence and the discovery of the green aluminum foil wrappers. *See* Docket Nos. 65-4 and 65-5. There was no embellishment nor twisting of the facts. Agent Jiménez stated in both affidavits that "law enforcement personnel conducted a federal arrest warrant operation at the TARGET DOMICILE," and that "[w]hile serving the arrest warrant and conducting a security sweep of the TARGET RESIDENCE [sic], officers observed the following items in plain view next to a safe and male shoes: a. One zip-lock bag containing numerous green aluminum wrappings commonly used, based on my training and experience, to package narcotics such as heroin."  Docket Nos. 65-4 at ¶¶ 11 and 13, and 65-5 at ¶¶ 20 and 22. These statements were perfectly consistent with the evidence deduced during the hearing—the defendant was arrested at the Residence's carport and the green foil wrappers were found during what the agents' believed was a valid protective sweep. Only upon further analysis does the Court now find that that protective sweep was unlawful. That does not mean, however, that the affiant misrepresented the facts to the Court.

Second, the evidence presented also does not show that either of the issuing magistrate judges abandoned their judicial roles. Nor does the defendant argue "that a mistake or abuse of discretion by [either of the two] Magistrate Judge[s issuing the challenged warrants] invalidated the search warrant[s]." Docket No. 107 at 21. Abandonment of a magistrate judge's judicial role includes instances when he or she does not act with the neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure warrant or when he or

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 44 of 46

*United States v. Fedwin Morales-Pérez*                                    Page 44
Crim. No. 23-300 (FAB-MDM)

she relinquishes to law enforcement the determination of what may be searched and seized. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979). No such conduct was involved in this case.

Third, in this case, there was no obvious legal infirmity in the form and content of the First and Second Search Warrants that would have forewarned the ATF agents as to a lack of probable cause or that would have vitiated their good faith reliance on the warrants. Indeed, because the same probable cause was presented to two different magistrate judges,[22] the agents had even more reason to act in reliance upon them.

The affidavits submitted in support of the applications in this case duly asserted a valid nexus between the object of the search and the crimes under investigation, and the warrants issued properly identified the place to be searched and the items to be seized. *Cf. Cordero-Rosario*, 786 F.3d at 70 (police officer's affidavit did not provide probable cause for search of defendant's computer and other electronic equipment, where defendant was being investigated for committing certain lewd acts, not for possession of illegal pornography, and affidavit said nothing about why existence of otherwise lawful pornography on computer would be relevant to investigation, or that pornographic material in question involved injured minor, or any minor at all); *see also Groh v. Ramirez, 540 U.S. 551, 565 (2004)* (where the warrant failed to particularly describe the things to be seized it was facially deficient—proceeding with the search was clearly "unreasonable" under the Fourth Amendment and the executing officers could not reasonably presume it valid) (citing *Leon*, 468 U.S. at 923). For that reason, the Court finds that in this case any reasonable law enforcement officer would have believed the search warrants to be valid and reasonably relied thereupon.

Moreover, the fact that upon review during a suppression proceeding, the Court determined that the protective sweep was unjustified does not mean *ipso facto* that there was any bad faith in requesting the warrants in the first place.

---

[22] The only difference between the two statements of probable cause is that the affidavit in support of the Second Search Warrant includes a sentence mentioning that Magistrate Judge Giselle López-Soler had previously authorized the First Search Warrant.

Case 3:23-cr-00300-FAB-MDM    Document 115    Filed 06/30/25    Page 45 of 46

*United States v. Fedwin Morales-Pérez*                                                    Page 45
Crim. No. 23-300 (FAB-MDM)

On the contrary, the First Circuit has stated that "an officer's decision to obtain a warrant is prima facie evidence that she was acting in good faith." *United States v. Mykytiuk*, 402 F.3d 773, 777 (1st Cir. 2005) (citing *Leon*, 468 U.S. 897 n.21 (1984)).

The purpose of the exclusionary rule is "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). This rule is triggered when the misconduct of law enforcement officers is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* Here, the Court is unpersuaded that there was any bad faith on the part of the executing officers in seeking or executing the First and Second Search Warrants. The officers acted pursuant to the warrants as authorized.

In sum, because the government acted in good faith reliance on the First and Second Search Warrants, and because the deterrent effects on law enforcement do not outweigh the great cost to society of suppressing the resulting evidence, suppression of the Electronic Evidence is not warranted.

## III.   CONCLUSION

For the reasons mentioned above, the Court **RECOMMENDS** that the Motion to Suppress (Docket No. 56) be **Granted in Part and Denied in Part**. More specifically, the Court recommends that the Abandoned Contraband **not be suppressed**, the green aluminum foil wrappers **be suppressed**, and the Electronic Devices seized as a result of the First and Second Search Warrants, including any information contained thereon, **not be suppressed**.

**IT IS SO RECOMMENDED.**

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United State  v. Valencia Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 30th day of June 2025.

*s/Marshal D. Morgan*
MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE
